We're happy to hear argument in our second case, Sanchez v. Sessions, whenever the lawyers are ready. We have pleased the court, Maureen Sweeney from the University of Maryland Immigration Clinic. Arguing this morning for the petitioner will be Barry Dallin, who is a third-year student in our law school. He will be arguing the egregiousness of the actions. Counsel for Amiki Matthew Price will be focusing on why the Lopez Mendoza standards should not apply to a state officer. Thank you very much. May it please the court, I'm honored to be here. This case involves an egregious violation of the Fourth Amendment because the seizure was based on race and because it was committed by an officer acting without any reasonable suspicion of a crime and without any authority to enforce federal immigration laws. Under Yanez Marquez v. Lynch, this court should suppress all evidence obtained from this egregious seizure and terminate our client's removal proceedings. The BIA correctly accepted the premise that Officer Acker violated our client's Fourth Amendment rights. The issue before the court today, therefore, is not whether our client's rights were violated, but rather whether the manner in which they were violated was egregious. While all of the Yanez Marquez factors weigh towards suppression here, five most clearly demonstrate why Officer Acker's conduct was egregious. First, Officer Acker acted on his racial animus towards Latino immigrants when seizing our client. Second, he procured no warrant. Third, he had no probable cause and reasonable suspicion of a criminal activity to arrest our client. Fourth, for Fourth Amendment purposes, this was a particularly lengthy seizure. And fifth, Officer Acker knowingly acted without any authority to conduct an immigration enforcement. Mr. Dallin, what do you believe is the moment of seizure in this fact pattern? Your Honor, at a minimum, the seizure occurred when the officer took our client's keys. However, the record reflects that the seizure likely happened well earlier, when the officer leaned into the vehicle and persistently began asking our client an unrelated question to the purpose of this encounter, which was retrieval of the Nissan. If we were to conclude that the seizure occurred, as you say, when the keys were seized, was there not a fact finding below that that seizure occurred after the incriminating statement made by Mr. Sanchez? Well, Your Honor, I believe that the record reflects and demonstrates the fact that the seizure actually occurred well earlier. At the point that the officer was asking the question. But I'm saying if we determine that the seizure occurred with the demand for the keys, the giving of the keys. If that's the point where the court finds this was the seizure, Your Honor, whatever our client may or may not have said to the officer, it did not give him probable cause or reasonable suspicion of criminal activity to detain our client. And he specified that he detained our client for purposes of an immigration violation, which is a civil infraction. And he also stated that was the purpose when our client asked him why he was being arrested. And again, this really goes to whether there was a Fourth Amendment violation. And under Santos, this was clearly a Fourth Amendment violation. Our focus here is on egregiousness. And this was. I think that my colleague's questions go to that very point of egregiousness. And what I think that you have to take into account is what was said to the immigration court, what the testimony was, and what findings what the immigration judge relied on. And that's, I think, a lack in perhaps your presentation and your briefs and maybe in your answers to questions. For better or for worse, whether you agree with it or not, you're stuck with what those findings were. Well, Your Honor, in Tassie v. Holder, this court held that where an IJ's finding is clearly erroneous, as in any reasonable fact finder would have found to the contrary. If you want to go on that standard. But I think it seems to me it's pretty thin to say on this record that these are clearly erroneous. The judge might have ruled differently, might have just construed the facts differently, might have decided some of these issues differently. But OK, if you want to say there's clear error, that's fine. Well, Your Honor. That's a pretty hard thing to prove. Absolutely, Your Honor. And it's not that we're arguing that he construed, you know, these facts differently or he weighed these facts differently. It's that he didn't weigh these facts at all. When he rendered the finding that this wasn't a racially motivated seizure, he based that solely on the fact that the officer asked alone, the statement alone, are you legal or illegal. But that blatantly ignored several credible statements in the record about other racially charged statements that this officer made. He referred to the driver in the Nissan as Pedro, a stereotypical Latino name. Not John Doe, not John Smith. He referred to him as a Spanish guy, which is a blatant reference to that ethnicity. He referred to him as it, a very dehumanizing term. And he testified, the officer testified, that their speaking Spanish was, quote, a real problem. Language is a proxy for race, Your Honor, as the Supreme Court held in Hernandez v. New York, and that's exactly how this officer used it. He generalized about our client's immigration status based on the language that he was speaking. And that's not the only factor here that demonstrated. So with respect to this question, I guess the question is, in terms of whether or not this was egregious, what the officer understood to be the state of the law at the time with respect to detaining someone who admitted to being in the country illegally. So what's your understanding of that state of the law? Your Honor, the state of the law at the time of this egregious seizure goes to one factor and one factor only. That's the intentionality of the officer's conduct. That's the Ninth Circuit standard. That's qualified immunity. This Court and Yanez Marquez explicitly rejected that standard. We look at the totality of the circumstances. At the time of that arrest, it was unlawful to detain someone solely for purposes, for a local officer to detain someone for purposes of an immigration violation. And that argument that the government proffers about Santos is undercut by the fact that the officer testified on the record that he knew that he had no authority to do what he was doing, and yet he did so anyways. Okay, so let's stop there. So you're saying that regardless of what we said in Santos, to include the fact that we identified a circuit split as to the authority of local law enforcement officers to detain somebody for an immigration violation, that didn't matter here because this officer specifically knew that he couldn't do that? Correct, Your Honor. The officer knew that he did not have authority to do what he was doing. There was no – And what's the basis for that? Well, Your Honor, I would say that there was no probable cause and reasonable – I don't know what's the basis for this particular officer's understanding of that. Did he know – did he admit to that? Yes, Your Honor. He testified on the record on administrative record page 548. He was asked, do you have authority to enforce immigration law? And he said, no, ma'am. And yet he proceeded undeterred to arrest our client for an immigration – for a suspected immigration violation. He was acting above the law, and that's particularly egregious when it's done by those tasked with enforcing it. Well, he says – and maybe this doesn't make a difference, but he used the term detained as opposed to arrest. Is there a difference? No, Your Honor, there's no difference. And what the officers may have subjectively thought in his mind about what he was doing does not cleanse his unlawful act. He was acting without – Whoa, whoa, whoa, whoa, whoa. But go back to the fact that at the time that this all took place, there's a circuit split identified by this court. So was the law clearly established at that time, and did he think that the law was clearly established? Your Honor, what the officer thought goes to his subjective intent in acting. But this is all about – you're saying that this is particularly egregious, and you're looking at his subjective intent. Well, that's one – That's what we're trying to find. Absolutely. That's what you've talked really – that's your strongest argument, it seems to me, about the egregiousness of this. Well, I would also point to the clear racial animus that was at play here. It's all hucked into one, that there's a racial animus and that there's – all right, go ahead. Well, it demonstrates the egregiousness, and the fact of the matter is, Your Honor, that what the officer knew or didn't know really goes to the qualified immunity standard. Santos found a violation before Santos had occurred. You can find a violation on novel facts. That's particularly clear. And what the officer may or may not have known goes to his intent. But in this instance, he knew that what he was doing was egregious. And not only did he know what he was doing was egregious in terms of seizing the client for civil immigration infraction, but this was also a particularly lengthy seizure for Fourth Amendment purposes. The purpose of this interaction was retrieval of the Nissan. He completely abandoned that purpose to pursue this race-based unlawful immigration enforcement. In Rodriguez, the Supreme Court found a seven- to eight-minute unrelated investigation to be unreasonable. Certainly, a three-and-a-half-hour unrelated and unlawful investigation should also be deemed unreasonable here and particularly lengthy. I see my time is up. Let me ask you one question before you sit down. It seems to me that the facts of this case pale in comparison to the Yanez-Marquez facts, where this Court held that the facts were not egregious. Do you agree? Respectfully, Your Honor, I disagree. I would say there are several differentiating factors. First of all, in Yanez-Marquez, that was an ICE raid, so there was a baseline of authority. This here was an officer acting without any authority, knowingly acting without any authority. Second of all, in Yanez-Marquez, the Court placed considerable emphasis on the procurement of a warrant and probable cause. Here, there was zero, no probable cause, no reasonable suspicion of criminal activity, and yet the officer proceeded with an unlawful arrest. Third, there was handcuffs and there was other means of the use of force in this instance, which were lacking in Yanez-Marquez. I think Yanez-Marquez involved guns being pointed to someone's head early morning outside the time period of execution of a warrant, doors being knocked down. It seemed more egregious than these facts, although the Court found it wasn't sufficiently egregious to invoke the exclusionary rule. May I disagree to that? Sure. Your Honor, first of all, that was pursuant to a finding of probable cause by an independent magistrate. Really where it came down to was the fact that it was 5 a.m. versus 6 a.m. and entering the house. And where there was a gun pointed at a head in Yanez-Marquez, there was blatant racial animus in this case. When asked why he was arresting our client, he said, because you're illegal and you're stealing jobs from Americans. This officer felt it was his job to act upon his racial animus. That statement was made, I think, after the handcuffs were put on in a car ride from the scene to the police headquarters. It was made from the police headquarters transporting him to ICE, which, by the way, the I.J. found on AR-397. He was doing sua sponte. ICE didn't prompt him to do this. This officer was on a mission. He was on a crusade. Actually, at that point, he was going home. He was going off shift. He was on that mission. He didn't want to stay around. I would say it just reemphasizes my point, Your Honor, that this officer was doing this on his own accord because he had racial animus towards Latino immigrants. Thank you very much. Thank you. Thank you. Your Honor, may it please the Court, Matthew Price on behalf of AMICI. I just want to start by briefly addressing, Judge Mats, one of your questions in the last argument, which goes to the standard of review. The question of egregiousness is a question of law. It's a totality of circumstances test, and it's a question of law as to how those factors, the facts that are found, are weighed with respect to egregiousness. Here the immigration judge did find all the relevant facts with respect to the racial remarks that were made, and the question is whether the immigration judge properly weighed them. The immigration judge didn't find all of the facts that you would have liked. Well, what I would say is the immigration judge didn't consider the circumstances that he found to have existed. I mean, the immigration judge credited all the tests. Are you also suggesting that the immigration judge's findings were clearly erroneous? Well, I think they were, but I think the key point here is that it doesn't matter whether they were because the standard for egregiousness is a question of law. But you take the findings, you apply the law to findings, right? That's right. So we take the findings that the immigration judge made. Well, the immigration judge found that all of these statements were made, right? Right. And don't quarrel with you about what the immigration judge found. The question was I thought that there was a suggestion that those findings were clear of error. I do think they were clear of error, but again, Your Honor. But you don't rely on them. But I'm not relying on them. That's right. And with respect to the Santos case and the state of the law at the time this happened, whatever you think of Santos, the law certainly was clearly established that an officer can't detain an individual motivated by race. And that goes back to the BIA's decision in matter of Toro, which is cited in Lopez Mendoza as the quintessential example of an egregious Fourth Amendment violation. But that takes it. Just that holding doesn't necessarily apply to this egregiousness inquiry in an immigration case. That's regular Fourth Amendment law, right? It doesn't make it more egregious, which is what we need here, right? But in Lopez Mendoza, Your Honor, the Supreme Court cited the matter of Toro decision from the BIA as an example of an egregious violation, and in that decision the BIA held that evidence should be suppressed when an individual is arrested motivated by race. So that is a quintessential example of an egregious violation of the Fourth Amendment. An individual who is stopped by whom? Well, in that case, in Lopez Mendoza, in a matter of Toro, it was individuals who were stopped by federal immigration officers. This case involves state officers, and that's perhaps a good transition to where I'd like to focus my argument for the remainder of the time. Before you go there, this officer had a speeding car suspected of being stolen, a driver who he suspected of being illegal, a car that pulled up and acted in a way inconsistent with the officer's training and experience in terms of owners coming to relieve a person of driving duties with respect to the subject call, and then you had an admission by Sanchez with respect to his alienation. None of that has anything to do with race. That's certainly true, Your Honor, but I think the significance of those factors is not that great in terms of the motivation of the officer's conduct because as soon as he discovered that the individuals were here unlawfully, he abandoned any interest in searching the car for vehicles or determining whether the car might have been stolen or whether there was drugs. I would suggest, Your Honor, that if you look at the circumstances in the case, race was clearly the predominant motivating factor behind the encounter. Well, why didn't you say that his interest was simply, even if improper or wrong, in enforcing the immigration laws? Why was his interest improper? No, no. Why couldn't the immigration judge simply conclude that his interest, even if misguided or improper given the state of the law, as your colleague has indicated, his interest was in enforcing the immigration laws, not necessarily an interest motivated by race? Well, again, Your Honor, it's a de novo test of what egregiousness means in light of the circumstances, and we think the circumstances suggest otherwise. But I would like to turn, if I may, to the question of whether the egregiousness test even applies in this case when you are dealing with state and local officers who are not supposed to have any role in enforcing immigration law at all. And the Supreme Court identified a number of reasons why it applied a more restricted exclusionary rule in the immigration context, and none of them apply to arrests by state and local officers who are not deputized under federal law under Section 1357G. The streamlined nature of the immigration proceedings would be the same then and the same now, would they not? Well, Your Honor, the Supreme Court emphasized that very few people at that time filed motions to suppress an immigration proceedings. That's no longer true. It happens with some frequency now. So that's the first point. That assumption is no longer the case. But the second point I'd make is that saying that evidence should be suppressed when it is derived from an unlawful arrest by a state or local officer doesn't require a full-blown evidentiary hearing. The question is very simple. Were you arrested by someone who had no authority to arrest you? And if the answer to that question is yes, then the evidence derived from that arrest should be suppressed. So this isn't a situation where you need to look into the officer's motivations. You don't need to look at all the circumstances of the arrest. All you need to ask is, was the officer authorized to conduct this arrest? Was the evidence derived from the arrest? And if so, it should be suppressed. It's a very simple inquiry. So I don't think it would needlessly complicate immigration proceedings at all. The Supreme Court also focused. The most important factor to the court was that INS had a comprehensive scheme for deterring violations of the Fourth Amendment, including training and other sorts of supervision. And these are in the regulations at 8 CFR 287.5. That's entirely absent here. And you can also see in Section 1357G, in situations where the federal government wants state and local officers to be enforcing immigration law, it requires that they get certain training, that they get certain certifications, that there's a written agreement between the federal government and the state or local authority that's going to be acting as immigration enforcers. Again, that's entirely absent here. And so there's a real need for deterrence on the Fourth Amendment side. Now, the Supreme Court did identify. Where's the deterrence need if your argument is correct that state and local law enforcement from this point forward are not going to be involved in immigration investigations? Well, that's the law, Your Honor, but unfortunately our experience is the officers don't always follow the law. And the point of the exclusionary rule is to deter violations of law that might otherwise take place because some officers, unfortunately, are not scrupulous in following the constraints on their authority. That's why we have the exclusionary rule. Hopefully it's a rule that's never used because no violations take place, but we all know, unfortunately, that that's not true. And so we need the deterrence. Now, the Supreme Court did emphasize in its case the cost. Can you think of another context in which we apply a different rule for state and local officers versus federal officers that are doing the same thing? Well, what I would say, Your Honor, is that in this case— The Fourth Amendment generally applies to both. Yeah, sure. I think the Supreme Court decided to apply a specially narrow rule in the context of federal officers for the reasons it gave, but those reasons don't apply to what ordinarily would be an appropriate use of the exclusionary rule in immigration proceedings. There is one more central point to the Supreme Court's case that I'd like to address if I could, which is the fact that there's an ongoing violation of law. The Supreme Court was troubled by that fact. I think the Arizona case makes clear that that's not so anymore. We understand now that immigration violations are civil violations, not criminal ones, and that ICE exercises lots of discretion in deciding whether to enforce immigration law. And in this case, two individuals in the car got prosecutorial discretion. And the federal government has decided the circumstances under which it wants state officers enforcing immigration law. And there's 1357G agreements to do that. Those circumstances are absent here. If the state had commanded the officer to make this arrest, that law would have been preempted because the federal government doesn't want state officers making immigration policy. And so, respectfully, here Congress has thought about the social cost of not allowing these arrests to take place at all and has said that's a social cost we're willing to bear because we want the federal government to be the one exclusively responsible for enforcing immigration law. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Kosei Yugimori. I represent the United States in this case. This position for review should be denied for two reasons. First, the Board properly declined to apply the exclusionary rule to civil removal proceedings where a petitioner failed to demonstrate an increased violation of the Fourth Amendment. And second, no court has adopted the petitioner's position that the exclusionary rule should apply in civil removal proceedings to the same extent it applies in criminal proceedings. It's undisputed and indisputable that the petitioner in this case is not lawfully in this country and has no right or privilege to remain here. The question here is whether this Court and the government should look the other way and permit an ongoing violation of the law, a result which is only required if there is an egregious violation of the Fourth Amendment. And that's not the case here. At bottom, what we have is a person who admitted to his unlawful status before the state officer. The Supreme Court's whole creation of this egregious violation was pretty clearly tied to characteristics of the immigration structure and immigration law that don't really translate to state officers. Would you agree with that? And so I'm just not exactly sure how we incorporate this egregious violation standard to them. Well, yes and no, Your Honor. They are different, but different in a way where it should be less the case. It should not be the case that a state officer who is not working within the same interest as an immigration officer, that the exclusionary rule would have any deterrent effect on a state officer, particularly as Judge Conrad noted, given that it is the law now, fairly clear after the United States versus Arizona in 2012, and certainly clear in this circuit after Santos versus Frederick County in 2013, that local officers do not have authority to detain persons based solely on civil immigration violations absent direction from the federal government. And, again, at bottom what we have here is a person who admitted to being unlawfully in the United States to a state officer. Well, I mean, I guess the argument could be that that makes it per se an egregious violation for a state officer. No, Your Honor. I didn't think you'd say yes, but that is a difference, yes, but maybe it doesn't cut in your favor. Well, the state officer in this case, what he did was he saw a clear federal violation, and what he did was then refer that person or transfer custody of that person to the appropriate federal agency that enforces such violations. And at the time, in 2009, there was a circuit split on the issue. So are you saying that the appellant in this case was never arrested? Well, he was detained. Wasn't the difference? Well, the difference was explained by the officer. He said there are two seizures, two types of seizures. He said there's an arrest, and then there's also detainment. An arrest is traditional witnessing a criminal activity and seizing the person. And then he said there's a detainment, which is when we assist an outside agency. We detain a person and then transfer custody to an agency such as ICE. And the officer here – Well, he may be making that decision, but I don't think the Supreme Court would make that decision. Yes, well, that's certainly no longer the case. But certainly in the Tenth Circuit, for example, the court has held that where there's probable cause of a civil immigration violation, the officer would be permitted to detain the person for purposes of transferring him to the appropriate enforcement agency. Now, of course, that's no longer the case after United States v. Arizona, and certainly in this circuit. But if I understood your response to Judge Monson's question, even after Arizona, an officer who engages in this conduct would not necessarily – that would not necessarily amount to an egregious violation of the court. You need something more. Well, if the law is as it is now, certainly there would be a stronger case for an egregious violation. But because an egregious violation is determined by a totality of the circumstances, it would be hard to say whether there would be a per se violation. But certainly there might be an egregious violation. But, again, that's not the case here. At the time, it was arguably permissible. But you know, because I bet you argue a lot of cases, we're not concerned just with the case here but the case down the road. I mean, that's the difference between the judges and the lawyers. You want to win the case you have, and we want to make a rule that applies to the cases that come after. And the rule could be applied. Are you ready to concede on behalf of the United States that in cases under the present law, that this could be just per se an egregious violation? Well, I'm not authorized to concede any point. I thought you just said that. Well, I said that it is possible that it could be, sure. But the circumstances of the case would dictate the result and not necessarily a rule that anybody who detains a person based solely on immigration, a civil immigration violation, that that would necessarily amount to an egregious case. Well, let's talk about the facts of this case because I understand the record. Notwithstanding this uncertainty that existed in the state of federal law, Arizona hadn't been decided, our Santos case hadn't been decided. The record seems to suggest that this officer clearly understood the limits of his authority under the law to detain people for immigration violations. Why isn't that? Why doesn't that make a difference here? It makes a difference because the officer... It does or it doesn't make a difference? Well, it does make a difference. Because the officer here said he did not have enforcement authority, but at the same time he says that's why we detained them. Again, this goes back to the officer's understanding of his duty as a law enforcement officer. If he sees a clear violation of federal law, is he to look the other way and ignore it or is he to transfer that person to the appropriate agency? At the time in 2009, it was arguably permitted for a state officer to, when he sees a clear violation of federal law, to detain that person in order to transfer him to the custody of the immigration enforcement agency. And so at the time, the officer testified to a distinction that if it was arguably permitted at the time, then there was an arguable Fourth Amendment violation. Then necessarily there has not been an egregious violation. You mean if it's only arguably, is that what you're saying? If it's only arguably a Fourth Amendment violation, it's not egregious. Is that your claim? I just didn't understand what you said. Well, what I'm saying is that if it was arguably permitted at the time, then it's unclear whether it was a Fourth Amendment violation until this court actually said it is. Then it should be much harder, more difficult to show that that arguably permitted exercise of authority was an egregious violation of the Fourth Amendment. I understand the record to be saying that the officer did not think he had authority to investigate immigration violations, but he wasn't acknowledging he didn't have the authority to detain once there was probable cause present to him for purposes of the authorized agency to continue the investigation. Am I right about that? Well, the government would agree with that characterization because when the officer said he does not have enforcement authority, he immediately stated that's why we detained him. Then he related accounts of past events when he had assisted ICE, and then sometimes ICE would tell him to hold on to them or to release them, and then other times when ICE would hold persons for his state agency. This isn't a one-time instance. This appears to have been perhaps an informal relationship between the state agency and the state officer here. What about the evidence of racial animus in this record? How do we deal with that? Well, first off, the petitioner here was seized after he admitted to being unlawfully in the United States. But second, to the extent there are some statements about illegal aliens, the officer here was asked, would you have asked about immigration, had this person had fair skin, blonde hair, and blue eyes? Someone from Norway, for example? Or, well... You and the government like Norway. Right, or other European countries or what have you. But the officer clearly testified that he had stopped Germans before, that he had actually experienced BWI Airport and also the Port of Baltimore, and also his testimony, his previous testimony about working with ICE. So, again, this isn't... And also he also testified that just in the past year at the time, which was 2009, of the 800 or 900 traffic stops, that there were three undocumented cases. So taking all of his statements together, this appears to be something that this officer, given his experience with immigration, was something that he probably was routinely asking every person in this case. Again, I mean, that fact is not fleshed out, because petitioners did not further pursue that line of questioning. But certainly the officer here denied that there was racial motivation behind his questioning, at least, of immigration. And under the Supreme Court's decision in Mulliver v. Menna decided in 2005, an officer may ask about immigration without implicating a separate Fourth Amendment incident. Well, there wasn't just asking about immigration. There were the statements about this particular class of immigrants. There was calling him by a name that had a racial context to it. I think that you're really not fairly dealing with the record when you just... Well, the fact that he may believe that there's a statement there that's characterized in the petitioner's declaration, that the officer believed that these were illegal immigrants and that they were taking jobs from Americans. Well, illegal immigrants does not connote a particular race. An illegal immigrant could be from Norway, could be from anywhere in Europe. But didn't he call him Poncho or Cisco or something? No, Your Honor. He called him Pedro. Pedro. Oh, sorry. Well, I'm sorry, but I characterize it like John or Peter or Ralph, all, you know, USA names. Well, Pedro is no less USA named than, I would say, John. John? It's a fine name. But in any event, I don't think it shows... You don't regard that as connoting an immigrant status and perhaps an illegal immigrant status more than John? I don't think it does, Your Honor, particularly given the record in this case where he was asked, would you have asked the immigration question had this person did not have fair skin and blonde eyes? I understand what he said. I'm asking you about this particular... What we say and what we do are sometimes... What we say we did and what we did do are sometimes different, right? Well, when we look at the facts here, there's some mention about illegal aliens, sure, that there's a violation. It could be that he, given the experience, is used to enforcing or wanting to help with the enforcement of immigration. That could be a possibility. He testified that he worked with ICE before, and sometimes ICE tells him, hold them. Sometimes ICE tells him not to hold them. There's clearly some informal relationship here. In addition to that, his mention of the name Pedro, that certainly doesn't compel the conclusion, definitely, that there's racial animus here. The officer is presented with a case where a person admits to being here unlawfully. The statement came after the arrest, and the seizure itself was not racially motivated. If the officer had used the name Ricky Bobby instead of Pedro, is there any other, at the point of seizure, is there any other evidence of racial animus? Not that I can pull, Your Honor. The only other possible thing is I believe when the officer stopped the first operator, he was talking to ICE, and the first operator allegedly overheard him say, I have a Spanish guy. So that would be, I believe, another factor that might favor finding towards racial animus. But again, when we look at the fact that, as I understand the record, his first question to the occupants of the car that drove up were, are you illegal? Does that suggest any kind of animus? Based on an assumption that because they happen to be, they look Spanish, they were speaking in Spanish. Well, first and foremost, the officer is permitted to ask an immigration question without raising a separate Fourth Amendment issue. Second, that encounter was consensual as immigration was found. And third, at the time he asked that question, according to the officer, what he said was, did you know that the first operator was undocumented? At which point, everybody quieted down. The person in the back seat looked like he was going to throw up. The person in the front seat, petitioner, had his hands both on the wheel, looking straight forward. And recall that the engine was still on at that point. And the officer thought, well, if these people are nervous because they are not here illegally, then I shouldn't fear weapons or drug trafficking along those lines. And I think it was reasonable under the circumstances for the officer to believe that he would be safe, had he just understood why these people were being nervous at the time. So again, the encounter was consensual. The police officers permitted to ask about immigration without implicating a separate Fourth Amendment incident. And third, the police officer here, under the circumstances, felt it was reasonable for him to ask for immigration. It wasn't completely a random question here. And you would compare this to, for example, Martinez Medina v. Holder, decided by the Ninth Circuit in 2011, where a sheriff and his deputy approached persons at a gas station. One person couldn't speak English. They didn't have ID. And at that point, they asked the immigration question, said, oh, do you have a green card? They said no. And then ICE got involved. And the Ninth Circuit said the police officer could ask about travel, where they're going, ID, who they are, and immigration without implicating the Fourth Amendment and changing the encounter from a consensual encounter to a Fourth Amendment seizure. And as far as the length of detention, Your Honor, the length of detention here was, at most, three and a half hours. But it should also be noted that, one, the police officer shortened the length of detention. It would have been much longer had he waited for ICE. Or ICE might not have ever collected these people. Well, ICE did ask for five additional hours. And, two, is that the detention, most of the detention occurred after ICE had already directed the officer to detain the person. Is it the government's submission that a state officer can change from, during the encounter, from being just a state officer to being a state officer working in conjunction with the federal government and, therefore, getting all the protections that the Supreme Court talked about? Well, I'm not quite sure about the ‑‑ stopped by a state officer, but because he then called ICE, he works with ICE, and, therefore, he counts as ICE. And we should treat him as this federal officer. You're not really suggesting that, are you? Well, yes and no, in the sense that, under Santos v. Frederick County, this Court has said that a 287G subsection 10, a cooperation authority ‑‑ Right, but you're not suggesting this is a cooperation authority that comes in the middle of the encounter. You can't just ‑‑ a state officer can't stop somebody illegally and then call up the Immigration Service and get a cooperation authority. No, no. I thought that's what you were suggesting. No, you're on. The initial seizure here is a Fourth Amendment violation. It's not permitted. But the officer here, in order to transfer the petitioner to ICE ‑‑ But you're always going to have that if the state officer sends the person to ICE. So you're always going to get into this cooperation, ultimately. Why does that have any independent significance? Well, because much of the detention in this case occurred after ICE had directed the officer to detain them. What difference does that make? It's just a factor to consider. Does that mean if you illegally detain somebody and 30 seconds later you call ICE and there's no detention at all because it's only been 30 seconds? No. The length of the detention is still the length of the detention. What the government is suggesting is that the nature of the detention is less egregious because much of the time in which the petitioner was detained was pursuant to ICE's authority. And to the extent that petitioners contend that the exclusionary rule should apply in all civil removal proceedings, no court has adopted that position. And, in fact, the Supreme Court in Lopez Mendoza held that the exclusionary rule does not apply in civil removal proceedings. That was the holding. The plurality opinion there mentioned an exception for egregious violations. And further, this court has also held in Yanis Marquez that the exclusionary rule does not apply in civil removal proceedings. And the arguments that the petitioners raised is actually already rejected in Maldonado v. Holder, a Second Circuit case, I believe, in 2014. And to the extent petitioners mention how there will not be any complications if the exclusionary rule were to apply, that's not the case, Your Honor. This case should have been, should have had a record of maybe 50 pages. Nothing is contested. Removability is not contested. He didn't seek alternative relief except voluntary departure. The case should be this thick. And instead we have a 1,500-page record with testimony from experts and a police officer and the petitioner and all these documents. And it just shows to prove that these types of suppression hearings are burdensome on the administrative proceedings. And the amici cite 153 cases, I believe, in their brief that in the past year there's been some cite to motion to suppress before the Board of Immigration Appeals. And they say that this shows an uptick in the amount of suppression issues in the board, and therefore applying the exclusionary rule would have more deterrent effect. But 153 cases, they don't distinguish among those which ones involve just state officers. And furthermore, the board adjudicates 30,000 cases at least every year. So that's 153 cases out of 100,000 cases. It's still the case as it was in 1984 when Lopez Mendoza was decided that the deterrent value here is not significant. At bottom we have a petitioner who was, who admitted to being illegally in the United States. The officer transferred that person to the appropriate agency for enforcement. That is not an egregious violation. That is not a basis for exclusion. And the petition for review should be denied. Thank you. Three quick points on rebuttal, Your Honor. This is the very type of situation that the Supreme Court in Arizona versus the United States sought to avoid. An instance where an officer unilaterally arrested an individual for an immigration violation for which they had no authority. That no understanding of cooperation would amount to that type of finding. And, you know, federal immigration enforcement is discretionary. This individual was interjecting himself into these discretionary decision-making. The ICE officers didn't want him. The IJ said he sui sponte brought them over. Our client testified and his companions swore to the fact that the ICE officer said, why did you bring him? We don't want you here. Nothing prevented ICE from saying, go your way. We don't want you. Once he brought him over there. Their ability to exercise their discretion was not impaired by the officer's transportation, was it? Well, Your Honor, the officer was infringing upon their very discretion. And ICE was exploiting the fact that it was exploiting the fruit of this egregious and unlawful arrest. And just transitioning, the frequency at which we see these unlawful immigration arrests conducted by local officers, that demonstrates the clear deterrent effect here. We cited in our brief to a Baltimore Sun article where police officers detain an individual, a United States citizen of Indian descent, solely based on her appearance. This administration has an executive order that's encouraging. Which is not the case here, right, because the detaining in this case was after an admission of illegal alien status. Well, Your Honor, the government conceded that there was a Fourth Amendment violation. And we don't look just at the moment of the seizure. We're looking at the totality of the circumstances here, the big picture, all of the factors at play here. The fact of the matter is, you know, the government, my co-counsel, the government here mentioned that the officer testified on the record that he would have done the same. He did that post hoc in the face of litigation. That's not how he acted in the day of this incident. The first thing out of his mouth... I don't know that. Well, the facts demonstrate that. Because the first thing out of his mouth was, are you legal or illegal? The only thing he knew at that point about our client was he looked Latino, he spoke Spanish, and he was affiliated with an individual who was Latino. Look, you may not think his testimony was credible, but he said he did this with Germans. He said he did it with everybody. So, I mean, you can quarrel with the testimony. We're proffering that that's not how he was acting day of. And there's also no distinction between an arrest and a detainment. Here, the officer clearly arrested him. He was hoping that subsequent authority would cleanse that act, and that's not how it occurs. In conclusion, Your Honor, this is the very type of egregious violation that this court held in Llanes, Marquez, where an officer acting on his racial animus towards Latino immigrants knowingly seized our client without any authority to do so. We therefore request that you suppress all evidence obtained from this seizure and terminate our client's removal proceedings. Thank you. Thank you very much. We will come down and greet the lawyers and then go directly to the next case.
judges: Diana Gribbon Motz, Albert Diaz, Robert J. Conrad Jr.